## DAVID FISHBEIN *v.* MICHAEL KOZLOWSKI, COMMISSIONER OF MOTOR VEHICLES
## (SC 15996)

McDonald, C. J., and Berdon, Norcott, Katz, Palmer, Peters and Callahan, Js.[1]

---

[1] This case first was argued before five justices of this court on May 27, 1999. Subsequent to oral argument, however, the court, sua sponte, ordered supplemental briefs and argument before an en banc court on the following additional issue: "Is the question of whether the police have a reasonable and articulable suspicion to justify an investigative stop outside the scope of the four issues to be considered at a [General Statutes] § 14-227b license suspension hearing?" Reargument before the court en banc was conducted on September 21, 1999.

Argued September 21—officially released December 22, 1999*

*Jeffrey D. Brownstein*, with whom, on the brief, was *Gregory A. Thompson*, for the appellant (plaintiff).

*Robert L. Marconi*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellee (defendant).

*Opinion*

MCDONALD, C. J. The plaintiff, David Fishbein, appealed to the Superior Court from the suspension of his motor vehicle operator's license by the defendant commissioner of motor vehicles (commissioner) pursuant to General Statutes (Rev. to 1995) § 14-227b, as amended by Public Acts 1995, No. 95-279.[2] In this admin-

---

* December 22, 1999, the date that this opinion was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[2] General Statutes (Rev. to 1995) § 14-227b, as amended by Public Acts 1995, No. 95-279, provides in relevant part: "(a) Any person who operates a motor vehicle in this state shall be deemed to have given his consent to a chemical analysis of his blood, breath or urine and, if said person is a minor, his parent or parents or guardian shall also be deemed to have given his consent.

"(b) If any such person, having been placed under arrest for operating a

istrative appeal, the plaintiff claimed that because the

motor vehicle while under the influence of intoxicating liquor or any drug or both or while his ability to operate such motor vehicle is impaired by the consumption of intoxicating liquor, and thereafter, after being apprised of his constitutional rights, having been requested to submit to a blood, breath or urine test at the option of the police officer, having been afforded a reasonable opportunity to telephone an attorney prior to the performance of such test and having been informed that his license or nonresident operating privilege may be suspended in accordance with the provisions of this section if he refuses to submit to such test or if he submits to such test and the results of such test indicate that the ratio of alcohol in his blood was ten-hundredths of one per cent or more of alcohol, by weight, and that evidence of any such refusal shall be admissible in accordance with subsection (f) of section 14-227a and may be used against him in any criminal prosecution, refuses to submit to the designated test, the test shall not be given; provided, if the person refuses or is unable to submit to a blood test, the police officer shall designate the breath or urine test as the test to be taken. The police officer shall make a notation upon the records of the police department that he informed the person that his license or nonresident operating privilege may be suspended if he refused to submit to such test or if he submitted to such test and the results of such test indicated that the ratio of alcohol in his blood was ten-hundredths of one per cent or more of alcohol, by weight.

"(c) If the person arrested refuses to submit to such test or analysis or submits to such test or analysis, commenced within two hours of the time of operation, and the results of such test or analysis indicate that the ratio of alcohol in the blood of such person is ten-hundredths of one per cent or more of alcohol, by weight, the police officer, acting on behalf of the commissioner of motor vehicles, shall immediately revoke and take possession of the motor vehicle operator's license or, if such person is a nonresident, suspend the nonresident operating privilege of such person, for a twenty-four-hour period and shall issue a temporary operator's license or nonresident operating privilege to such person valid for the period commencing twenty-four hours after issuance and ending thirty days after the date such person received notice of his arrest by the police officer. The police officer shall prepare a written report of the incident and shall mail the report together with a copy of the completed temporary license form, any operator's license taken into possession and a copy of the results of any chemical test or analysis to the department of motor vehicles within three business days. The report shall be made on a form approved by the commissioner of motor vehicles and shall be subscribed and sworn to under penalty of false statement as provided in section 53a-157b by the arresting officer. If the person arrested refused to submit to such test or analysis, the report shall be endorsed by a third person who witnessed such refusal. The report shall set forth the grounds for the officer's belief that there was probable cause to arrest such person for operating a motor vehicle while under the influence

police were not legally justified in stopping his vehicle, the commissioner's decision to suspend the plaintiff's license on the basis of the evidence of intoxication obtained pursuant to the stop was improper. The trial court dismissed the appeal, holding that the police had legally stopped the plaintiff's vehicle. The plaintiff then appealed to the Appellate Court, which affirmed the trial court's judgment. *Fishbein* v. *Kozlowski*, 48 Conn. App. 552, 711 A.2d 733 (1998). This court granted the plaintiff's petition for certification limited to the issue of whether the Appellate Court properly had concluded that the police had reasonable suspicion to justify stopping the plaintiff's vehicle.[3] *Fishbein* v. *Commissioner of Motor Vehicles*, 247 Conn. 901, 719 A.2d 902 (1998). After the initial oral argument, we ordered supplemen-

of intoxicating liquor or any drug or both or while his ability to operate such motor vehicle is impaired by the consumption of intoxicating liquor, and shall state that such person had refused to submit to such test or analysis when requested by such police officer to do so or that such person submitted to such test or analysis, commenced within two hours of the time of operation, and the results of such test or analysis indicated that the ratio of alcohol in the blood of such person was ten-hundredths of one per cent or more of alcohol, by weight.

"(d) Upon receipt of such report, the commissioner of motor vehicles may suspend any license or nonresident operating privilege of such person effective as of a date certain, which date shall be not later than thirty days after the date such person received notice of his arrest by the police officer. Any person whose license or operating privilege has been suspended in accordance with this subsection shall automatically be entitled to a hearing before the commissioner to be held prior to the effective date of the suspension. The commissioner shall send a suspension notice to such person informing such person that his operator's license or nonresident operating privilege is suspended as of a date certain and that he is entitled to a hearing prior to the effective date of the suspension and may schedule such hearing by contacting the department of motor vehicles not later than seven days after the date of mailing of such suspension notice. . . ." Unless otherwise indicated, all references in this opinion to § 14-227b are to that statute as revised to 1995 and amended by Public Acts 1995, No. 95-279.

[3] The certified question was, "Did the Appellate Court properly conclude that the police had reasonable and articulable suspicion to justify stopping the plaintiff's vehicle?" *Fishbein* v. *Commissioner of Motor Vehicles*, 247 Conn. 901, 719 A.2d 902 (1998).

tal briefs and additional argument before an en banc court on the following issue: "Is the question of whether the police have a reasonable and articulable suspicion to justify an investigative stop outside the scope of the four issues to be considered at a § 14-227b license suspension hearing?" We answer that question in the affirmative, and, accordingly, affirm the judgment of the Appellate Court.[4]

The essential facts of this case, as revealed in the record, are undisputed. On March 5, 1996, police officers were conducting a surveillance of a house at 180 Poplar Street in New Haven. The police suspected that the house was a favored spot for illegal drug transactions. At 2:15 a.m., a car driven by the plaintiff stopped at the house. The plaintiff turned off the car's headlights and motor, and a passenger exited the car and went to the door of the house. The passenger knocked on the door and had a brief conversation with the person who opened the door. The passenger then returned to and entered the car, and the plaintiff started the car and turned on the lights. Although the car was not yet in motion, the police officers effectuated a stop by pulling their cruiser alongside and turning on the cruiser's overhead lights.

Officer Peter A. Beckwith approached the car and questioned the plaintiff regarding his reasons for being at that address. When the plaintiff responded to the officer's questions, the officer smelled alcohol on his breath. The officer then asked for the plaintiff's registration and insurance papers. He had to repeat the request three times before it was understood by the plaintiff. The officer proceeded to order the plaintiff out of the car and administered a series of field sobriety tests to the plaintiff. The plaintiff failed each test. At that point,

---

[4] Because we conclude that the legality of an investigative stop is not within the scope of a license suspension hearing held pursuant to § 14-227b, we do not decide whether the Appellate Court properly concluded that the investigative stop was justified.

the officer read an implied consent advisory[5] to the plaintiff, and the plaintiff agreed to take a breath test at the police station. Thereafter, the officer arrested the plaintiff on a charge of driving under the influence of intoxicating liquor, informed the plaintiff of his *Miranda*[6] rights, and brought the plaintiff to the police station where he administered two breath tests to the plaintiff. Both breath tests showed that the plaintiff's blood alcohol level exceeded the limit set forth in General Statutes § 14-227a.[7]

On the basis of these facts, the commissioner issued a notice to the plaintiff, advising him of a proposed ninety day suspension of his operator's license, and informing him that he was entitled to request a hearing on the suspension. Following the plaintiff's request, a hearing was held, at which the commissioner determined that the four elements set forth in General Statutes (Rev. to 1995) § 14-227b (f), as amended by Public Acts 1995, No. 95-279, §§ 1 and 2 (now § 14-227b [g]),[8] had been met, and, therefore, that the plaintiff's operator's license would be suspended.

[5] Section 14-227b (b) provides for the giving of an implied consent advisory to persons arrested for operating a vehicle while under the influence. See footnote 2 of this opinion.

[6] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[7] General Statutes § 14-227a provides in relevant part: "(a) Operation while under the influence. No person shall operate a motor vehicle while under the influence of intoxicating liquor or any drug or both. A person commits the offense of operating a motor vehicle while under the influence of intoxicating liquor or any drug or both if he operates a motor vehicle on a public highway of this state or on any road of a district organized under the provisions of chapter 105, a purpose of which is the construction and maintenance of roads and sidewalks, or on any private road on which a speed limit has been established in accordance with the provisions of section 14-218a, or in any parking area for ten or more cars or on any school property (1) while under the influence of intoxicating liquor or any drug or both or (2) while the ratio of alcohol in the blood of such person is ten-hundredths of one per cent or more of alcohol, by weight.. . ."

[8] General Statutes (Rev. to 1995) § 14-227b (f), as amended by Public Acts 1995, No. 95-279, provides: "If such person contacts the department to schedule a hearing, the department shall assign a date, time and place for the hearing, which date shall be prior to the effective date of the suspension.

The issues before this court on appeal are: (1) is the question of whether the police have reasonable and articulable suspicion to justify an investigative stop outside the scope of the four issues to be considered at a license suspension hearing pursuant to § 14-227b (f); and (2) if the answer to the first question is no, did the commissioner properly find that the police had reasonable and articulable suspicion to stop the plaintiff? Because we answer the first question in the affirmative, we need not answer the second question.

General Statutes (Rev. to 1995) § 14-227b (d), as amended by Public Acts 1995, No. 95-279, provides in

At the request of such person or the hearing officer and upon a showing of good cause, the commissioner may grant one continuance for a period not to exceed fifteen days. If a continuance is granted, the commissioner shall extend the validity of the temporary operator's license or nonresident operating privilege issued pursuant to subsection (c) of this section for a period not to exceed the period of such continuance. The hearing shall be limited to a determination of the following issues: (1) Did the police officer have probable cause to arrest the person for operating a motor vehicle while under the influence of intoxicating liquor or drug or both or while his ability to operate such motor vehicle was impaired by the consumption of intoxicating liquor; (2) was such person placed under arrest; (3) did such person refuse to submit to such test or analysis or did such person submit to such test or analysis, commenced within two hours of the time of operation, and the results of such test or analysis indicated that the ratio of alcohol in the blood of such person was ten-hundredths of one per cent or more of alcohol, by weight; and (4) was such person operating the motor vehicle. In the hearing, the results of the test or analysis shall be sufficient to indicate the ratio of alcohol in the blood of such person at the time of operation, except that if the results of the additional test indicate that the ratio of alcohol in the blood of such person is twelve-hundredths of one per cent or less of alcohol, by weight, and is higher than the results of the first test, evidence shall be presented that demonstrates that the test results and analysis thereof accurately indicate the blood alcohol content at the time of operation. The fees of any witness summoned to appear at the hearing shall be the same as provided by the general statutes for witnesses in criminal cases." Unless otherwise indicated, all references in this opinion to § 14-227b (f) are to that statute as amended to 1995, as amended by Public Acts 1995, No. 95-279.

Section 14-227b was amended further by Public Acts 1998, No. 98-182, §§ 20 and 22, and subsection (f) thereby became subsection (g). The text of the subsection was not changed.

relevant part: "Any person whose license or operating privilege has been suspended in accordance with this subsection shall automatically be entitled to a hearing before the commissioner to be held prior to the effective date of the suspension. . . ." Subsection (f) provides in relevant part that "[t]he hearing shall be limited to a determination of the following issues: (1) Did the police officer have probable cause to arrest the person for operating a motor vehicle while under the influence of intoxicating liquor or drug or both or while his ability to operate such motor vehicle was impaired by the consumption of intoxicating liquor; (2) was such person placed under arrest; (3) did such person refuse to submit to such test or analysis or did such person submit to such test or analysis, commenced within two hours of the time of operation, and the results of such test or analysis indicated that the ratio of alcohol in the blood of such person was ten-hundredths of one per cent or more of alcohol, by weight; and (4) was such person operating the motor vehicle. . . ."

The plaintiff now argues that the "probable cause to arrest" element in § 14-227b (f) implicitly incorporates a requirement that the *initial* investigative stop of the driver of a vehicle be lawful. If the stop is unlawful, his argument continues, the commissioner is without authority to suspend his license. The plaintiff further argues that any other interpretation would violate the constitutional requirements of due process. Neither the commissioner nor the trial court considered this issue, as they both assumed that a determination of the legality of the stop was required. The Appellate Court upheld the trial court's determination that there had been a reasonable and articulable suspicion to justify the stop of the plaintiff's vehicle and concluded that the trial court had properly dismissed the plaintiff's appeal, but did not address the supplemental issue in this appeal. *Fishbein* v. *Kozlowski*, supra, 48 Conn. App. 557.

The question before us is a matter of statutory interpretation and, as such, constitutes a question of law subject to de novo review. See *In re Eden F.*, 250 Conn. 674, 690, 741 A.2d 873 (1999). "In seeking to discern [statutory] intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) Id.

It is well settled that "[w]here the meaning of a statute . . . is plain and unambiguous, the enactment speaks for itself and there is no occasion to construe it. Its unequivocal meaning is not subject to modification by way of construction." (Internal quotation marks omitted.) *Pitchell* v. *Hartford*, 247 Conn. 422, 432, 722 A.2d 797 (1999). This court previously has held that the language of § 14-227b (f), limiting the issues to be considered at a license suspension hearing, is plain and unambiguous. See *Buckley* v. *Muzio*, 200 Conn. 1, 7, 509 A.2d 489 (1986) ("[t]he language of . . . § 14-227b [f] is plain and unambiguous"); see also *Bialowas* v. *Commissioner of Motor Vehicles*, 44 Conn. App. 702, 711, 692 A.2d 834 (1997) (same).

We also have held repeatedly that the plain language of the statute expressly and narrowly limits the scope of the license suspension hearing to the four issues enumerated in the statute. See *Harrington* v. *DelPonte*, 229 Conn. 51, 59, 639 A.2d 1028 (1994) (statute limits issues properly raised on appeal from license suspension, and officer's failure to comply with regulation requiring certification to operate breath test would not be basis for overturning license suspension if other elements demonstrated); *Schallenkamp* v. *DelPonte*, 229 Conn. 31, 40, 639 A.2d 1018 (1994) (same); *Volck* v. *Muzio*, 204 Conn. 507, 512, 529 A.2d 177 (1987) (because

hearing limited to four enumerated issues, multiple failures by arresting officer to comply with statutory dictates of § 14-227b not sufficient grounds for overturning commissioner's determination that operator's license should be suspended); *Buckley* v. *Muzio*, supra, 200 Conn. 7 (hearing limited to four enumerated issues and commissioner not required to determine whether subject of hearing understood consequences of refusal to submit to chemical testing before suspending license). The Appellate Court has held in *Dalmaso* v. *Dept. of Motor Vehicles*, 47 Conn. App. 839, 844, 707 A.2d 1275 (1998), that the admitted failure of the police to comply with subsection (b) of the statute, requiring police to afford the arrested person an opportunity to call his attorney, was irrelevant in a suspension hearing. See also *Bialowas* v. *Commissioner of Motor Vehicles*, supra, 44 Conn. App. 710 (subsection [f] of § 14-227b does not provide for adjudication of multiple procedural errors by police under subsection [b] of statute, but is limited to four enumerated issues).

This court has not addressed previously the specific question of whether the "probable cause to arrest" element of subsection (f) incorporates a requirement that there be legal grounds for the underlying initial stop. We see no reason, however, to depart from our previous interpretation that the statutory language narrowly limits the license suspension hearing to the four issues expressly enumerated. A common theme of our cases construing § 14-227b is that "the restriction of a license suspension hearing to the four issues specified in [§ 14-227b (f)] is indicative of the legislative view that the failure to comply precisely with the [criminal procedure] requirements of subsection (b) should not prevent suspension of the license of a person, arrested with probable cause for believing he was operating under the influence or with impaired ability as a result of intoxicating liquor, who has refused to submit to the

prescribed tests"; *Volck* v. *Muzio*, supra, 204 Conn. 514; or who, as in this case, has taken the tests and has been found to have a blood alcohol level in excess of the statutory limit. While "the legislature has attached certain consequences to departures from the procedures specified in § 14-227b (b) and has provided a substantial incentive for the police to comply with those procedures" in the context of criminal proceedings; id.; "the legislature has manifested its intention that noncompliance with subsection (b), not involving one of the four issues to be determined pursuant to subsection (d) [which became subsection (f) of the version of the statute under consideration], does not preclude the suspension of the license of a driver" when the four enumerated elements have been demonstrated. Id., 516.

In *State* v. *Hickam*, 235 Conn. 614, 624, 668 A.2d 1321 (1995), cert. denied, 517 U.S. 1221, 116 S. Ct. 1851, 134 L. Ed. 2d 951 (1996), we concluded that "[a]n examination of the legislative history of § 14-227b reveals that a principal purpose for the enactment of the statute was to protect the public by removing potentially dangerous drivers from the state's roadways with all dispatch compatible with due process."[9] This court in *Hickam* distin-

---

[9] In *Hickam*, we found the following legislative history to be instructive: "Legislators expressed the hope that 'this bill [would] save lives . . . [because] anywhere from 20–30 people, Connecticut residents [would] be spared . . . .' 32 H.R. Proc., Pt. 30, 1989 Sess., p. 10,562, remarks of Representative Christopher Burnham. Legislators also hoped that the bill would send a 'message that we will not tolerate drunken drivers on our roads . . . [and] the loss of life and property on our roads as a result of drunken drivers.' 32 S. Proc., Pt. 12, 1989 Sess., p. 3979, remarks of Senator Anthony V. Avallone. Other legislators noted that there was a 'need to do . . . something stronger than we have done by strictly our criminal laws, something that will use the administrative process in a prompt and sure fashion to make sure that those who drive and drink, don't do so for very long.' Id., p. 3985, remarks of Senator Richard Blumenthal. 'This bill goes a long way toward restoring . . . the safety that we all expect and deserve in traveling on our roads.' Id., p. 3986, remarks of Senator James H. Maloney." *State* v. *Hickam*, supra, 235 Conn. 624–25.

guished license suspension proceedings, the primary purpose of which is to promote public safety by removing "those who have demonstrated a reckless disregard for the safety of others" from the state's roadways, from criminal proceedings, the primary purpose of which is punishment. Id., 626. This court concluded that when a driver is subject to criminal prosecution, the license suspension hearing is not barred by the constitutional double jeopardy prohibition on multiple punishments for the same offense. Id., 628. In *Schallenkamp* v. *Del-Ponte*, supra, 229 Conn. 42, and *Harrington* v. *DelPonte*, supra, 229 Conn. 51, we determined that although a failure to comply with a regulation requiring certification of the officer who administers the breath analysis test would render any test results inadmissible in a criminal proceeding under § 14-227a (c), it was not a basis for overturning the commissioner's decision when the four elements enumerated in § 14-227b (f) had been established. Thus, we have indicated repeatedly that a license suspension hearing is not a criminal proceeding and that the subject of such a hearing is not entitled to all of the procedural protections that would be available in a criminal proceeding.

We accordingly conclude in this case that the legislature did not intend that the lack of a reasonable and articulable suspicion to justify an initial investigatory stop would be a basis for overturning the commissioner's decision if the commissioner finds that, subsequent to the stop, "the police officer [had] probable cause to arrest the person for operating a motor vehicle while under the influence of intoxicating liquor . . . ." General Statutes (Rev. to 1995) § 14-227b (f), as amended by Public Acts 1995, No. 95-279. We further conclude that failure to comply with the requirements for criminal prosecution as they apply to investigatory stops should not prevent suspension of the license of a person arrested upon probable cause to believe that he was

operating under the influence of intoxicating liquor. See *Volck* v. *Muzio*, supra, 204 Conn. 514. Any interpretation that prevented the commissioner from suspending the license of a person who was stopped without a reasonable and articulable suspicion, but whom the police subsequently had probable cause to arrest for driving under the influence, would undermine the primary purpose of the statute, which is "to protect the public by removing potentially dangerous drivers from the state's roadways with all dispatch compatible with due process." *State* v. *Hickam*, supra, 235 Conn. 624. Nothing in the legislative history of § 14-227b (f) suggests a contrary interpretation. Therefore, we conclude that the legislature did not intend the probable cause to arrest requirement in subsection (f) to incorporate all of the procedural protections that would be available to the plaintiff in a criminal proceeding. Accordingly, we reject the plaintiff's argument that, in the context of § 14-227b (f), probable cause requires a finding of a reasonable and articulable suspicion to make the initial stop.

Our narrow reading of the probable cause requirement in subsection (f) is fully consistent with the requirements of due process. We are persuaded that the statute's probable cause requirement, coupled with its provision for an administrative hearing, affords a driver all the constitutional protection to which he is entitled. Due process requires that "[a] state must afford notice and opportunity for hearing appropriate to the nature of the case before the [license suspension] becomes effective." (Internal quotation marks omitted.) *Hickey* v. *Commissioner of Motor Vehicles*, 170 Conn. 136, 144, 365 A.2d 403 (1976).

Whether the procedure accorded at a hearing is "appropriate to the nature of the case"; (internal quotation marks omitted) id.; is to be determined by considering three factors: "First, the private interest that will be affected by the official action; second, the risk of

an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (Internal quotation marks omitted.) *Illinois* v. *Batchelder*, 463 U.S. 1112, 1117, 103 S. Ct. 3513, 77 L. Ed. 2d 1267 (1983); see also *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

Applying the due process analysis set forth in *Illinois* v. *Batchelder*, supra, 463 U.S. 1117, to this case, we recognize, with regard to the first consideration, that the plaintiff has an interest in continuing the use of his license during the suspension period. With regard to the second consideration, we conclude that, because the commissioner must find at the license suspension hearing that the police had probable cause to arrest for driving under the influence, a requirement that the police must have a reasonable and articulable suspicion justifying the initial stop would accomplish nothing toward reducing the risk of an erroneous license suspension. Finally, we find that the interest of the government in expeditiously removing intoxicated drivers from the state's roadways is great; see id., 1118 (finding that "[t]he interest of the States in depriving the drunk driver of permission to continue operating an automobile is particularly strong" and recognizing "[t]he carnage caused by drunk drivers" [internal quotation marks omitted]); and that the state's interest substantially outweighs the driver's interest in continuing the use of his license during the suspension period.

Furthermore, the plaintiff's argument assumes that the exclusionary rule precluding use of evidence obtained as a result of an improper search or seizure is applicable, not only to a criminal proceeding, but also to a civil hearing held pursuant to § 14-227b. We

disagree. "The general rule in a criminal proceeding is that statements and other evidence obtained as a result of an unlawful, warrantless arrest are suppressible if the link between the evidence and the unlawful conduct is not too attenuated." (Internal quotation marks omitted.) *Immigration & Naturalization Service* v. *Lopez-Mendoza*, 468 U.S. 1032, 1040–41, 104 S. Ct. 3479, 82 L. Ed. 2d 778 (1984). "[T]he [exclusionary] rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures . . . . Application of the rule is thus appropriate in circumstances in which this purpose is likely to be furthered." (Internal quotation marks omitted.) *Payne* v. *Robinson*, 207 Conn. 565, 570, 541 A.2d 504, cert. denied, 488 U.S. 898, 109 S. Ct. 242, 102 L. Ed. 2d 230 (1988). "[I]n the complex and turbulent history of the rule, the [United States Supreme] Court never has applied it to exclude evidence from a civil proceeding, federal or state." *Immigration & Naturalization Service* v. *Lopez-Mendoza*, supra, 1041–42 (holding that rule does not apply in deportation proceedings); see also *Pennsylvania Board of Probation & Parole* v. *Scott*, 524 U.S. 357, 363, 118 S. Ct. 2014, 141 L. Ed. 2d 344 (1998) (recognizing that "we have repeatedly declined to extend the exclusionary rule to proceedings other than criminal trials" and holding that rule not applicable in parole revocation proceedings); *United States* v. *Janis*, 428 U.S. 433, 448, 454, 96 S. Ct. 3021, 49 L. Ed. 2d 1046 (1976) (holding that rule does not apply in civil tax proceedings); *United States* v. *Calandra*, 414 U.S. 338, 343–46, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974) (holding that rule does not apply in grand jury proceedings). "[B]ecause the rule is prudential rather than constitutionally mandated, [it has been held] to be applicable only where its deterrence benefits outweigh its substantial social costs." (Internal quotation marks

omitted.) *Pennsylvania Board of Probation & Parole v. Scott*, supra, 363. "[T]he need for deterrence and hence the rationale for excluding the evidence are strongest where the Government's unlawful conduct would result in imposition of a criminal sanction on the victim of the search." *United States* v. *Calandra*, supra, 348.

In *Payne* v. *Robinson*, supra, 207 Conn. 571, we concluded that "application of the [exclusionary] rule [in probation revocation proceedings] would at best achieve only a marginal deterrent effect." We reasoned that any illegally obtained information would be inadmissible in a criminal trial; *Mapp* v. *Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961); and that, where the police officer was unaware that the suspect was on probation, exclusion of the evidence in a probation revocation hearing would not enhance appreciably the deterrent effect already created by the inadmissibility of the evidence at a criminal trial. *Payne* v. *Robinson*, supra, 571. We further reasoned that "[s]ince the use of evidence in a probation revocation hearing falls outside the offending officer's zone of primary interest; *United States* v. *Janis*, supra, [428 U.S.] 458; exclusion of such evidence will not significantly affect a police officer's motivation in conducting a search."[10] (Internal quotation marks omitted.) *Payne* v. *Robinson*, supra, 571.

---

[10] In *Payne*, because the defendant conceded that only the exclusionary rule under the fourth amendment to the United States constitution was at issue, this court declined to consider whether article first, § 7, of the Connecticut constitution would compel a different result. *Payne* v. *Robinson*, supra, 207 Conn. 570 n.3. Because the plaintiff in this case has failed adequately to brief his claim under the state constitution, we do not consider it here. See *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 44–45, 699 A.2d 101 (1997) (this court not required to review issues improperly presented through inadequate brief); *State* v. *Tweedy*, 219 Conn. 489, 510 n.17, 594 A.2d 906 (1991) (same).

We conclude in this case that "the local law enforcement official is already 'punished' by the exclusion of the evidence in the state criminal trial. That, necessarily, is of substantial concern to him." *United States* v. *Janis*, supra, 428 U.S. 448. The exclusion of the evidence in the license suspension hearing would be of only incremental deterrent value. That value is substantially outweighed by the societal interest in having otherwise reliable evidence of probable cause to arrest for driving under the influence presented at the hearing. Accordingly, we conclude that due process does not require the exclusionary rule to apply at hearings held pursuant to § 14-227b (f).

The plaintiff argues that, if a reasonable and articulable suspicion for the initial stop need not be demonstrated at the license suspension hearing, and if the exclusionary rule does not apply at the hearing, then the police will be encouraged to conduct arbitrary or discriminatory stops on the mere chance of subsequently establishing probable cause to arrest for driving under the influence. We are unpersuaded by this argument for the following reasons: First, the exclusion of any illegally obtained evidence in criminal proceedings, which are the police officer's primary zone of interest, provides a deterrent to such conduct. Second, we will not assume that the police will expend scarce law enforcement resources to stop motorists whom they have no articulable reason to suspect of any offense on the mere chance of establishing probable cause. Finally, the Connecticut legislature, in Public Acts 1999, No. 99-198, § 2 (a), has required that "each municipal police department and the Department of Public Safety shall adopt a written policy that prohibits the stopping, detention or search of any person when such action is solely motivated by considerations of race, color, ethnicity, age, gender or sexual orientation, and the action would constitute a violation of the civil rights

of the person." A violation of this official written policy would likely subject the police officer to disciplinary action. Subsection 2 (e) of that act further provides that "[i]f a municipal police department or the Department of Public Safety fails to comply with the provisions of this section, the Chief State's Attorney may recommend and the Secretary of the Office of Policy and Management may order an appropriate penalty in the form of the withholding of state funds from such department or the Department of Public Safety." This statute provides a direct disincentive for police to make discriminatory investigatory stops. In summary, we reject the plaintiff's argument envisioning wholesale arbitrary or discriminatory investigative stops.

We conclude that neither the statute as written nor the constitutional requirements of due process require the commissioner to determine at a license suspension hearing that the police had reasonable and articulable suspicion to justify the initial investigative stop. Accordingly, we need not determine whether the police had a reasonable and articulable suspicion justifying the stop of the plaintiff in this case.

The judgment of the Appellate Court is affirmed.

In this opinion KATZ, PALMER, PETERS and CALLAHAN, Js., concurred.

BERDON, J., dissenting. This court should interpret a statute without turning a blind eye to common sense[1]

---

[1] "This court traditionally eschews construction of statutory language which leads to absurd consequences and bizarre results." (Internal quotation marks omitted.) *Stamford Ridgeway Associates* v. *Board of Representatives*, 214 Conn. 407, 427, 572 A.2d 951 (1990); see also *Caltabiano* v. *Planning & Zoning Commission*, 211 Conn. 662, 667, 560 A.2d 975 (1989); *State* v. *Rodgers*, 198 Conn. 53, 61, 502 A.2d 360 (1985).

and fundamental constitutional principles.[2] The majority's narrow interpretation of General Statutes (Rev. to 1995) § 14-227b (f), as amended by Public Acts 1995, No. 95-279, §§ 1 and 2,[3] now § 14-227b (g), however, is

[2] "We . . . indulge in every presumption in favor of the statute's constitutionality . . . ." *State* v. *Leary*, 217 Conn. 404, 410, 587 A.2d 85 (1991); see also *State* v. *Breton*, 212 Conn. 258, 269, 562 A.2d 1060 (1989); *Motor Vehicle Manufacturers Assn. of the United States, Inc.* v. *O'Neill*, 212 Conn. 83, 100, 561 A.2d 917 (1989); *Zapata* v. *Burns*, 207 Conn. 496, 507–508, 542 A.2d 700 (1988); *State* v. *Hernandez*, 204 Conn. 377, 385, 528 A.2d 794 (1987). "We undertake this search for a constitutionally valid construction when confronted with criminal statutes as well as with civil statutes." *State* v. *Breton*, supra, 269; see also *State* v. *Leary*, supra, 410; *State* v. *Snook*, 210 Conn. 244, 251, 555 A.2d 390, cert. denied, 492 U.S. 924, 109 S. Ct. 3258, 106 L. Ed. 2d 603 (1989); *State* v. *Champagne*, 206 Conn. 421, 437, 538 A.2d 193 (1988).

[3] General Statutes (Rev. to 1995) § 14-227b (f), as amended by Public Acts 1995, No. 95-279, provides: "If such person contacts the department to schedule a hearing, the department shall assign a date, time and place for the hearing, which date shall be prior to the effective date of the suspension. At the request of such person or the hearing officer and upon a showing of good cause, the commissioner may grant one continuance for a period not to exceed fifteen days. If a continuance is granted, the commissioner shall extend the validity of the temporary operator's license or nonresident operating privilege issued pursuant to subsection (c) of this section for a period not to exceed the period of such continuance. The hearing shall be limited to a determination of the following issues: (1) *Did the police officer have probable cause to arrest the person for operating a motor vehicle while under the influence of intoxicating liquor or drug or both or while his ability to operate such motor vehicle was impaired by the consumption of intoxicating liquor;* (2) *was such person placed under arrest;* (3) did such person refuse to submit to such test or analysis or did such person submit to such test or analysis, commenced within two hours of the time of operation, and the results of such test or analysis indicated that the ratio of alcohol in the blood of such person was ten-hundredths of one per cent or more of alcohol, by weight; and (4) was such person operating the motor vehicle. In the hearing, the results of the test or analysis shall be sufficient to indicate the ratio of alcohol in the blood of such person at the time of operation, except that if the results of the additional test indicate that the ratio of alcohol in the blood of such person is twelve-hundredths of one per cent or less of alcohol, by weight, and is higher than the results of the first test, evidence shall be presented that demonstrates that the test results and analysis thereof accurately indicate the blood alcohol content at the time of operation. The fees of any witness summoned to appear at the hearing shall be the same as provided by the general statutes for witnesses

not reflective of the legislature's intent[4] nor mindful of the constitutional consequences of that statutory construction. It is clear that for the defendant, the commissioner of motor vehicles (commissioner), to suspend a motor vehicle operator's license, he must prove that a police officer had a reasonable and articulable suspicion that the driver had committed or was about to commit a crime to justify an investigatory stop of the automobile as a precondition of the finding of "probable cause to arrest" and "placed under arrest" elements of § 14-227b (f). The majority comes to the contrary conclusion. This holding, which condones a police officer's unconstitutional invasion of a person's privacy, is simply unprecedented.

I

I must first address a matter of vital concern to me. The majority decision gives police officers carte blanche to practice racial profiling.[5] The majority legitimizes a police officer stopping a person to determine if there was " 'probable cause to arrest the person for

in criminal cases." (Emphasis added.)

Section 14-227b (f) was amended further by Public Acts 1998, No. 98-102, §§ 20 and 22, whereby subsection (f) became subsection (g). To be consistent with the majority, references herein are to § 14-227b (f) as amended by Public Act 95-279. See footnote 8 of the majority opinion.

[4] "[W]hen called upon to interpret a statute, we will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." (Internal quotation marks omitted.) *State* v. *Floyd*, 217 Conn. 73, 79, 584 A.2d 1157 (1991); see also *State* v. *Leary*, 217 Conn. 404, 410, 587 A.2d 85 (1991); *McConnell* v. *Beverly Enterprises-Connecticut, Inc.*, 209 Conn. 692, 705–706, 553 A.2d 596 (1989).

[5] Justice Norcott, writing for the majority in *State* v. *Donahue*, 251 Conn. 636, 648, 742 A.2d 775 (1999), noted a concern about the "insidious specter of 'profiling' . . . ." Justice Norcott wrote: "As defined in the racial context, 'profiling' has come to refer to the practice of 'singl[ing] out black and Hispanic drivers based on ostensible traffic violations and subject[ing] them to criminal searches.' . . . [T]he concern that is identified in the context of racial profiling is . . . that the constitutional rights of the defendant are violated as a result of a police stop predicated on no reasonable and articulable suspicion." (Citations omitted.) Id., 648–49 n.11.

operating a motor vehicle while under the influence of intoxicating liquor . . . .' " Accordingly, an African-American or a Hispanic, or for that matter anyone operating a motor vehicle, may be targeted, have her privacy invaded, and be humiliated and harassed based on the whim of a police officer. The officer can invade an individual's privacy under the pretext of ascertaining probable cause that the person was operating her motor vehicle under the influence of alcohol or drugs without any reasonable and articulable suspicion that she was indeed operating under the influence or committing some other crime.[6] This is not only contrary to any reasonable interpretation of § 14-227b (f) and unconstitutional, it simply flies in the face of the legislative policy prohibiting racial profiling as enacted in Public Acts 1999, No. 99-198.[7] The ramifications of this decision for minorities is frightening.

The majority bypasses the concern about racial profiling by contending that the only consequence of a police

---

[6] I am concerned about the overzealous police officer who readily acts on subjective rather than reasonable suspicions. Unfortunately, the majority fails to face the reality that Connecticut law enforcement officials continue to use racial and other types of profiling. Minorities who live in Connecticut and those who pay attention to news reports cannot help but come to this conclusion. Although those officers who do not live up to their oath by indulging in such subjective practices are probably few in number, their impact on justice and the quality of life for minority residents is enormous.

[7] Public Acts 1999, No. 99-198, provides in relevant part the following: "Section 1. . . . (a) For the purposes of this section, 'racial profiling' means the detention, interdiction or other disparate treatment of an individual solely on the basis of the racial or ethnic status of such individual.

"(b) No member of the Division of State Police within the Department of Public Safety, a municipal police department or any other law enforcement agency shall engage in racial profiling. The detention of an individual based on any noncriminal factor or combination of noncriminal factors is inconsistent with this policy.

"(c) The race or ethnicity of an individual shall not be the sole factor in determining the existence of probable cause to place in custody or arrest an individual or in constituting a reasonable and articulable suspicion that an offense has been or is being committed so as to justify the detention of an individual or the investigatory stop of a motor vehicle. . . ."

officer stopping a citizen is an administrative hearing that may result in the suspension of her operator's license. That misses the point: It is not the resulting administrative hearing that is of concern, but rather the initial invasion of a citizen's privacy. This is not a totalitarian government but a democracy. We have a right to walk down the street or operate a motor vehicle without being harassed by the police. Our right of privacy should not be invaded unless the police officer has a reasonable and articulable suspicion that the person is violating the law.

According to the majority, we need not be concerned about this because we can assume that the police will not "expend scarce law enforcement resources to stop motorists whom they have no articulable reason to suspect of any offense on the mere chance of establishing probable cause." This calls for two responses. First, it is obvious that the majority believes that we live in Alice's Wonderland.[8] Second, let us not just assume that the police will not interfere with a person's privacy but let us mandate it by requiring that the officer have a reasonable and articulable suspicion.

## II

As the procedural history reveals, both the trial court and the Appellate Court assumed that the police officer needed a reasonable and articulable suspicion to make the initial stop of the plaintiff, David Fishbein. The trial court held that although the police officer need not have probable cause to make an investigatory stop, he must have had a "reasonable and articulable suspicion that a person has committed or is about to commit a

---

[8] L. Carroll, Through the Looking Glass (Messner ed. 1982); *Sears, Roebuck & Co.* v. *Board of Tax Review*, 241 Conn. 749, 767, 699 A.2d 81 (1997) (*McDonald, J.*, with whom *Berdon, J.*, joined, dissenting); *Doe* v. *Statewide Grievance Committee*, 240 Conn. 671, 688, 694 A.2d 1218 (1997) (*Berdon, J.*, dissenting).

crime." The trial court determined that the police officer had such grounds to stop the plaintiff[9] and sustained the commissioner's suspension of his driver's license. The Appellate Court predicated its decision on the police officer's stop being justified by a "reasonable and articulable suspicion," and affirmed the trial court's decision that there was such suspicion.[10] *Fishbein* v. *Kozlowski*, 48 Conn. App. 552, 557, 711 A.2d 733 (1998). Judge Lavery of the Appellate Court dissented on the basis that the facts of this case did not reach the level of reasonable and articulable suspicion. Id., 561.

The majority of this court affirms the Appellate Court, not on the basis that the police officer had a reasonable and articulable suspicion, but, rather, that no such suspicion was required. In other words, a police officer, without more than the barest suspicion, may stop a citizen, infringe upon her constitutional rights and subsequently gain sufficient evidence to support probable cause to arrest her for operating a motor vehicle while

[9] The trial court, in upholding the police officer's stop of the plaintiff, reasoned that "[i]n the case before the court, the police suspected the building in question of being a spot where illegal drug trafficking had taken place. They further were suspicious of the entire neighborhood, and that is presumedly why they were assigned to surveillance there.

"Those facts, combined with the very late hour, 2:15 in the morning, and the actual activity of the [plaintiff's] passenger going from the vehicle, going to the suspicious building, coming back and getting into the car were, in the court's opinion, sufficient basis for stopping the vehicle to investigate further."

[10] The Appellate Court found that "[i]n this case, the police officers observed the plaintiff's vehicle at 2:15 a.m. on a street known for illicit drug sales. [The plaintiff's passenger] left the vehicle and went to the door of a residence reputed to be a place where drugs were sold. The door opened slightly and [she] had a brief conversation with an occupant.

"Under these circumstances, the officers had an objective basis to suspect that the plaintiff may have been involved in the purchase of narcotics. The facts of this case support the determination that a reasonable and articulable suspicion existed to justify the stop of the plaintiff's vehicle. We conclude that the trial court properly dismissed the plaintiff's appeal." *Fishbein* v. *Kozlowski*, 48 Conn. App. 552, 557, 711 A.2d 733 (1998).

under the influence of liquor or drugs in accordance with the requirements of § 14-227b (f) (1). The commissioner never advanced this argument. Rather, he argued merely that we should strictly construe the probable cause requirement of § 14-227b (f). The majority of this court, through its own advocacy, raised the issue and ordered rebriefing. The majority would do well if it would be as vigilant in protecting the constitutional rights of our citizens.

## III

Judge Maloney in his well reasoned opinion in *Field* v. *Goldberg*, 42 Conn. Sup. 306, 618 A.2d 80 (1991), explicated the reasoning and the legislative history that clearly supports the requirement that an officer must have a reasonable and articulable suspicion to stop a vehicle as follows: "An axiomatic rule of statutory construction is that statutes 'should be construed so that no part of a legislative enactment is to be treated as insignificant and unnecessary, and there is a presumption of purpose behind every sentence, clause or phrase in a legislative enactment.' *84 Century Ltd. Partnership* v. *Board of Tax Review*, 207 Conn. 250, 263, 541 A.2d 478 (1988). The obvious purpose of the legislature in including the probable cause and arrest requirements in the administrative procedure on license suspensions was to ensure that that procedure would be subject to minimum basic constitutional safeguards. The legislative history of the administrative hearing statute, General Statutes § 14-227b (f), supports this interpretation. In 1981, the license suspension procedure was removed from the judicial system and transferred to the department of motor vehicles, which was charged with the responsibility of providing a hearing and determining whether a license should be suspended for violation of the per se law. See Public Acts 1981, No. 81-446; *Volck* v. *Muzio*, [204 Conn. 507, 515, 529 A.2d 177 (1987)]. In introducing and explaining [Public Act

81-446] to the [S]enate, Senator Clifton A. Leonhardt remarked as follows: 'Some people have raised the question does this Bill go too far? Is it a little too stringent? And I would like to go through some of the protections that are built into the Bill. First of all, *no one can be asked to be given this test [to measure blood alcohol content] unless they have been arrested for probable cause for driving under the influence so there has to be some independent source of the arrest; erratic driving, speeding and then the smelling of the breath and that sort of thing. The police officer has to have independent probable cause for administering the test* . . . and then very importantly, the Bill makes provision for an immediate post suspension hearing . . . so that the Constitutional due process rights of drivers are protected.' 24 S. Proc., Pt. 18, 1981 Sess., pp. 5672–73. Later, speaking in support of the act, Senator Howard T. Owens, Jr., responded to a question concerning constitutional safeguards as follows: 'Now, Senator [Eugene R.] Skowronski points out the fact that the tests or the safeguards for probable cause are not that great, but when I worked on this ·Bill with Senator Leonhardt, and when I worked on it in the Committee, one of the things, one of the alternatives that was given to us was that the police officer should have a right to stop anyone and give them a test and *one of the things that I felt that was very important was that the probable cause be built in. For instance, before a test could be administered, that the probable cause had in fact, to be established first* . . . . And I can say that I don't think that the police officers will act arbitrarily and I think that that probable cause test that was put in there will make certain that before the test was given, that they have someone and that the test will be used merely to buttress what has already been shown to the police officer when he makes this arrest or in fact, the probable cause is established.' Id., pp. 5685–86." (Emphasis added.) *Field* v. *Goldberg,* supra, 315–16.

I agree with Judge Maloney that the legislature intended that basic constitutional protections apply to the license suspension procedure. The statutory requirements that there be "probable cause to arrest" and that the person be "placed under arrest" are constitutional guarantees that would be rendered meaningless unless this court requires that the police officer have a reasonable and articulable suspicion before making the initial stop. An investigatory stop can lead to further invasions into an individual's privacy as she is subject to arrest, to invasive testing of her breath or blood alcohol content and to the suspension of her operator's license. Given that a police officer's unlawful stop of a suspect invalidates her subsequent arrest; *State* v. *Scully*, 195 Conn. 668, 678–79, 490 A.2d 984 (1985), an unconstitutional investigatory stop cannot be the basis of the license suspension procedure. The legislature's inclusion of probable cause requires that a police officer take the necessary steps of finding a reasonable and articulable suspicion before attaining the heightened standard. This heightened standard is meaningless when the lower rungs of reasonable and articulable suspicion are removed and replaced with a police officer's subjectivity.[11]

*Field* has been controlling law since 1991. The legislature, which has met in annual session at least seven times since *Field* was decided, did not amend it with respect to the requirement that there be a reasonable and articulable suspicion. "It is presumed that the legislature is mindful of judicial construction relevant to legislation it has enacted. . . . It is further presumed that when the legislature subsequently acts with respect

[11] Furthermore, it is apparent that the state agreed that the police must have a reasonable and articulable suspicion. After *Field* was decided in 1991, the state initially appealed to the Appellate Court but withdrew that appeal six months later. *Field* v. *Goldberg*, supra, 42 Conn. Sup. 306 (footnote of Reporter of Judicial Decisions).

to a statute, it does so with full awareness of relevant judicial interpretations." (Citations omitted; internal quotation marks omitted.) *Davis* v. *Forman School*, 54 Conn. App. 841, 845–46, 738 A.2d 697 (1999). Because the legislature visited § 14-227b by amending the subsection at issue four times since *Field*, including in 1998 by No. 98-182, § 20, of the 1998 Public Acts, wherein it completely reorganized § 14-227b, its intent has been made clear that reasonable and articulable suspicion is a requirement before a police officer can make an initial stop and invade the privacy of a person. If the legislature disagreed with *Field*, it surely would have amended § 14-227b to clarify the law. It did not do so. See *Cappellino* v. *Cheshire*, 226 Conn. 569, 576, 628 A.2d 595 (1993); *Lumbermens Mutual Casualty Co.* v. *Huntley*, 223 Conn. 22, 30, 610 A.2d 1292 (1992).

Other states with similar statutes which refer to the "arrest" of a person have concluded that the police officer must have a reasonable and articulable suspicion that the person has committed or is about to commit a crime. An Illinois implied consent statute providing that a suspect be "placed under arrest," has been interpreted to require "a lawful and valid arrest." *People* v. *Krueger*, 208 Ill. App. 3d 897, 903–904, 567 N.E.2d 717 (1991), cert. denied, 503 U.S. 919, 112 S. Ct. 1293, 117 L. Ed. 2d 516 (1992). The Illinois Appellate Court reasoned that "this construction is consistent with our duty to ascertain and give effect to the intent of the legislature and to avoid, if possible, a construction which would raise doubts regarding the constitutionality and validity of the statute. . . . [I]t is our duty to avoid a construction that would open the constitutionality of the implied-consent law to serious question. Although the State characterizes the issue in this case as whether to apply the exclusionary rule to a civil summary suspension proceeding, we believe that the real question before us is whether the statute affirmatively authorizes

the Secretary of State to suspend a motorist's license on the basis of a search which itself is the product of an unauthorized arrest. The Secretary's power to impose a summary license suspension is derived from the statute, and we decline to read the statute as, in effect, authorizing unconstitutional arrests or searches and the imposition of new deprivations based on those unconstitutional arrests or searches." (Citations omitted.) Id., 904–905. The court further noted that the state's authority to suspend an operator's license was based upon the operator's consent to submit to blood alcohol tests as a condition of obtaining a license. "To hold that motorists waive their right to be free of unconstitutional arrests and searches as a condition of operating motor vehicles would do violence to the principle of implied consent." Id., 905. Thus, operators do not consent to be subject to unreasonable searches and seizures.

Similarly, a Michigan implied consent statute providing that " '[a] person who operates a vehicle upon the public highways of this state . . . is arrested' " was interpreted to require a lawful arrest. *Gallagher* v. *Secretary of State*, 59 Mich. App. 269, 275, 229 N.W.2d 410 (1975). The Michigan Court of Appeals noted that "[w]e are acutely aware of what is at stake in this question of statutory construction. We have not the slightest inclination to dilute in the most minute degree the public purpose of apprehending and convicting intoxicated or impaired drivers. No less are we inclined to give a statute an unconstitutional interpretation and render nugatory all the good that was the legislative purpose in passing the act. We cannot conceive that the Legislature had the remotest intention . . . to mean that law enforcement officers can on what they alone consider 'reasonable grounds' without any judicial restraint, supervision, or requirement of prior valid arrest, request a citizen to take a chemical test of bodily substances

or suffer the grave penalty of license loss or suspension on refusal to comply. Hence we hold that the sine qua non to energize the statutory mandate of the 'implied consent' law is a prior valid arrest." Id., 275–76.

A federal District Court struck down a South Dakota implied consent law as unconstitutional because it failed to require a lawful arrest. *Holland* v. *Parker*, 354 F. Sup. 196, 199 (D.S.D. 1973). "Thus it would seem that if a police officer, implementing search and seizure procedures in accordance with constitutional proscriptions, cannot require a person to take a blood test without a warrant unless there is a lawful arrest and emergency circumstances, then neither could the officer demand that a licensee submit to the blood test, without these same constitutional prerequisites, when refusal would result in automatic loss of his license. If it were any other way, the Fourth Amendment protections would be rendered valueless since asserting them would result in a penalty potentially more severe than conviction for the alleged public offense." Id.

What the majority would have us believe is that when the legislature provided for the requirement that there be an "arrest," it also meant an illegal arrest by a police officer who did not even have a reasonable and articulable suspicion. I cannot believe the legislature would intend, under any circumstances, that an operator's license could be suspended as a result of an unconstitutional invasion of a person's privacy.

Accordingly, I conclude that the state must prove as part of the statutory requirements of "probable cause to arrest" and that a "person was placed under arrest" that the police officer have a reasonable and articulable suspicion that the operator has committed or is about to commit a crime to justify the initial investigatory stop. I also agree with Judge Lavery's dissenting opinion that "[t]o satisfy the reasonable and articulable standard

on [the] facts [of this case], in light of the totality of the circumstances presented here, there needed to be something more. There needed to be some overt act." *Fishbein* v. *Kozlowski*, supra, 48 Conn. App. 560.

Accordingly, I dissent.

NORCOTT, J., dissenting. Because I believe that the dissenting opinion of Judge Lavery in the Appellate Court decision in this case is persuasive, I cannot agree with the majority opinion set forth today. Judge Lavery in his dissent argued that the facts of the this case did not reach the level of a reasonable and articulable suspicion. Judge Lavery correctly noted that " '[t]he fact that [the plaintiff] was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that [the plaintiff] himself was engaged in criminal conduct.' *Brown* v. *Texas*, [443 U.S. 47, 52, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979)]." *Fishbein* v. *Kozlowski*, 48 Conn. App. 552, 560, 711 A.2d 733 (1998). I agree. Succinctly put, I fail to understand how there can follow the furtherance of any state purpose, be it criminal or administrative, when the police have failed to meet even the threshold requirement, i.e., a reasonable and articulable suspicion, that forms the basis of their authority to interfere with the Connecticut citizenry.

Initially, I was moved by the commissioner's argument that, given the limited administrative context of the proceeding involved, we should strictly construe the probable cause requirement of General Statutes (Rev. to 1995) § 14-227b (f), as amended by Public Acts 1995, No. 95-279, §§ 1 and 2, now § 14-227b (g). See *Volck* v. *Muzio*, 204 Conn. 507, 511–12, 529 A.2d 177 (1987) (license suspension hearing limited to determination of four issues set forth in what is currently § 14-227b [g]). I also remain aware of the very valid public policy concern to rid our highways of drunken drivers, which the legislation requiring immediate license sus-

pension and postsuspension hearing was designed to address. Nonetheless, I do not believe that the legislature's concomitant concern for the protection of the constitutional due process rights of drivers[1] is met by disregarding the requirement of a reasonable and articulable suspicion without which, in my opinion, probable cause cannot be found.

In the absence of any factual predicate upon which a reasonable and articulable suspicion could be based, the police in the present case should have had no further involvement with the driver. For these reasons, I respectfully dissent from the majority opinion.[2]

[1] As Senator Howard J. Owens, Jr., stated on the floor of the Senate, "one of the alternatives that was given to us was that the police officer should have the right to stop anyone and give them a test and one of the things that I felt that was very important was that the probable cause be built in. For instance, before a test could be administered, that the probable cause had in fact, to be established first . . . . And I can say that I don't think that the police officers will act arbitrarily and I think that [the] probable cause test that was put in there will make certain that before the test was given, that they have someone and that the test will be used merely to buttress what has already been shown to the police officer when he makes this arrest or, in fact, the probable cause is established. . . ." 24 S. Proc., Pt. 18, 1981 Sess., pp. 5685–86.

[2] I agree with Justice Berdon's dissent in this case (pp. 57–58), to the extent that the same concerns regarding profiling that were raised in *State v. Donahue*, 251 Conn. 636, 648–49, 742 A.2d 775 (1999), are resonant here. As *Donahue* fully explains this court's concerns, there is no need to repeat them here.

